W. D. O'KELL, Respondent, v. CHAMA VALLEY LANDS & IRRIGATION COMPANY, a Corporation, and ROBERT J. MARTIN and J. H. BORDERS, Appellant.

Kansas City Court of Appeals, July 6, 1914.

1. **REAL ESTATE BROKERS: Corporations: Commissions.** Where one is employed by land speculators to sell land for them and they conceal themselves behind the paper screen of a corporation that was never brought into legal existence, he is entitled to recover his commission from such speculators, since they were the real incorporators and sole owners of all the capital stock, and the amount of their stockholder's liability exceeded the debts they had paid by an amount sufficient to discharge all of the remaining unpaid liabilities.

2. ———: ———: **Creditors of Corporation.** A creditor of a corporation may have an action at law against the stockholders where the corporation has ceased to be a going concern, has disposed of all its tangible assets, has no means or hope of resuscitation and the statutory liability of the stockholders is sufficient to discharge all of its unpaid debts.

Appeal from Jackson Circuit Court.—*Hon. Frank G. Johnson*, Judge.

AFFIRMED.

*George L. Davis* for appellant.

*Haff, Meservey, German & Michaels* for respondent.

JOHNSON, J.—This is a suit for commissions plaintiff alleges he earned pursuant to a contract of employment with the defendant corporation, in the name of which the individual defendants attempted to sell a tract of land lying in Colorado and New Mexico. The tract contained almost 500,000 acres and was a part of a still larger body known as the "Tierra Amarilla Grant" which was owned by the Arlington Land Company, a corporation, subect to a mortgage of $705,000. Martin and Borders, who were partners doing business in Kansas City as land speculators and whose operations had been most extensive and profitable, were the owners of forty per cent of the capital stock of the Arlington Company, as well as of a large part of the mortgage indebtedness against the lands, and were employed by that company to dispose of its lands to investors for a commission of five per cent. They had in their service a large and well-organized corps of agents through whom they had successfully promoted other sales as extensive as that contemplated. Plaintiff was one of their agents and had been in charge of their selling operations in the western half of the State of Iowa. The record is very voluminous and the method pursued by Martin and Borders in placing the lands on the market is intricate and not clearly outlined in the evidence, but as we understand the case the successive steps in the proceeding were as follows:

Martin and Borders and their associates in the Arlington Company procured the incorporation of another company under the name of the Mosota Land Company and a contract was drawn by which the Arlington Company, in consideration of the surrender by Martin and Borders of their interest as stockholders, agreed to convey the tract of 500,000 acres to the Mosota Company. A contract was entered into between the Mosota Company and Albert D. Hart, Elmer E. Auchmoody and Wm. Kent, by the terms of which these

men, who really were acting for Martin and Borders, were granted an option to purchase the tract at $3.10 per acre on "liberal terms of payment." Thereupon Hart, Auchmoody and Kent, as incorporators, but acting under the direction and for the benefit of Martin and Borders, procured the incorporation of the defendant company under the laws of Missouri and "paid in full" its capital stock of $100,000, by the transfer to the corporation of the option contract with the Mosota Company, which the incorporators valued at "more than $100,000." An elaborate plan for the sale of the land was adopted and the agency department of Martin and Borders was employed. Shortly after the organization was completed and the selling operations inaugurated, Hart, Auchmoody and Kent, who held certificates for all the capital stock "sold out" to Martin and Borders who assumed open control of the corporation and its affairs.

For some reason the contract between the Arlington and Mosota companies was not signed but was abandoned and a new contract was entered into between the Arlington Company and the defendant company. This contract is not in evidence but we gather from the testimony of the witnesses that it imposed a number of conditions and restrictions on the defendant company, the performance of which would cost that company about $2,000,000, for which it would receive the tract of 500,000 acres. During all this time Martin and Borders had not surrendered their stock or other interests in the Arlington Company and, consequently, they had interests on both sides of the transaction between the two companies. For the purposes of sale the plan adopted by the defendant company and advertised and exploited in its name contemplated the division of the irrigable portions of the land into ten-acre tracts and of the nonirrigable parts "into tracts larger than ten acres, the size of the tract to be determined by the character of the soil and the distance

from transportation, but to be as nearly as possible of the sale value as 10 acres of irrigable land.''

The ''contracts'' the agents were employed to sell were valued at $250 each and the agents were allowed a gross commission of $50 on each contract sold. The purchase price of a contract could be paid in monthly installments and the contract was not for the sale of a particular lot but for an undivided interest in the whole body of land. There was to be an ''opening'' or auction sale of the various tracts conducted under the auspices of trustees to be selected by the contract holders at which no one but such holders would be permitted to bid. Before the auction sale the defendant company was to set aside a fund of $1,000,000 out of the proceeds of sales of contracts for the purpose of establishing ''a thoroughly modern system of irrigation.'' It was represented in the advertising literature and by the agents that the company controlled water rights that were sufficient for the requirements of the elaborate irrigation system to be installed and paid for out of the proceeds of sales of ''contracts'' to investors. Many such contracts were sold. The total number is not shown but plaintiff sold 142 in his territory on which he was entitled to commissions which, after deducting all advances and payments received by him amounted to $845. At this stage of the selling operations Martin and Borders discovered that neither they nor the Arlington Company had any water rights owing to a ruling of the United States Reclamation Service which was making vast improvements on the rivers in that region and refused to relinquish its claim to their waters. Martin and Borders appear to have conceded the superior right of the Reclamation Service to control the distribution of the waters and immediately took steps to save themselves from loss on account of the failure of their project which was made inevitable by the ruling just mentioned. A resolution was passed by the defendant company for the forfeiture

of "contracts" when the holders became delinquent in their monthly payments. The agents, including plaintiff, were instructed to cease selling contracts and to interview the holders in their respective territories and endeavor to exchange their contracts for new ones in a land selling scheme of Martin and Borders in Florida.

The evidence of plaintiff tends to show that he carried out these instructions and succeeded in effecting an exchange of twenty-four of the contracts. Afterwards Martin and Borders refunded the money paid in by all the holders of the contracts who refused to exchange. They claim they expended $35,000 in this manner for the account of the defendant company. Further they claim that during the period of its activity the defendant company received $77,000 on account of the timber cutting and grazing privileges it sold to purchasers.

The petition is in four counts. The first three are for the recovery of the amount due plaintiff as commissions for selling the contracts and the fourth for the recovery of compensation for his services in attempting to transfer "contracts" to the Florida project. The position taken by plaintiff in his petition is that the defendant company was organized by Martin and Borders for their benefit, that its capital stock was not paid and that on the discovery that the enterprise must fail, the corporation was abandoned and Martin and Borders took over its assets and assumed its liabilities.

Among the defenses of Martin and Borders it is insisted that plaintiff consented to and participated in the abandonment of the project and thereby agreed to a modification of his contract of employment, that the sum of $77,000 received by the defendant corporation for the timber and grazing privileges should be treated as a payment upon the capital stock of the corporation, and that since Martin and Borders in

advancing $35,000 to pay the losses of the incorporation became its creditors, they are entitled to set off that sum against their stockholders' liability, to its complete extinguishment.

The court, sitting as a jury, made and filed findings of fact as follows:

"1.   That at the time of the incorporation of the defendant Chama Lands & Irrigation Company, nor thereafter, was its stock paid in full, either in money or its equivalent.

2.   That the original incorporators of the defendant company were acting for and in behalf of the defendants Robert J. Martin and J. H. Borders in securing the incorporation of the said company and subscribing for its capital stock, and that the defendants Martin and Borders were the only ones having any substantial interest therein at that time, or at any time since, and that at all times the business of said company has been managed, controlled and operated by or under the directions of said Martin & Borders.

3.   That said company is insolvent and has no tangible assets and is not now engaged in business.

4.   That defendants Martin & Borders are the owners in equal amount of all the shares of stock of said defendant company, for which they paid no money or equivalent therefor, and with full knowledge at all times of the transactions and business of said company.

5.   That there is due to plaintiff and he is entitled to recover on the three first counts of plaintiff's amended petition the sums of seven hundred and seventy-five dollars, and three hundred and ninety-five dollars, less credits aggregating three hundred and twenty-five dollars—being a net total of eight hundred and forty-five dollars, with interest thereon at the rate of six per cent from April 24, 1912, the date when this suit was instituted.

6.   That plaintiff is entitled to recover on the fourth count of his amended petition the sum of two hundred

and thirty-one dollars, with interest thereon at the rate of six per cent from April 24, 1912, the date when this suit was instituted.

7. That plaintiff has never waived or agreed to waive any of his commissions for the sales of the contracts set forth in the statement of account attached to his amended petition.

8. That solely through the fault of the defendant company it was unable to carry out the terms of the contracts sold by the plaintiff for said defendant company, and that plaintiff has performed the obligations resting upon him under his contract with the defendant company, and is entitled to commissions under said contract.

9. That on or about July 11, 1911, defendants Martin & Borders took over all of the assets and property of the defendant company with full knowledge of the business and transactions of said company, and thereby assumed its obligations, including its obligation to plaintiff.

10. That as to plaintiff, defendants Martin & Borders are not entitled to offset any payments they have made for the defendant company, since the time they took possession of said assets.

The court, therefore, sitting as a jury, finds the issues for the plaintiff and against the defendant. The Chama Valley Lands & Irrigation Company and the defendants Robert J. Martin and J. H. Borders upon the first three counts of plaintiff's amended petition, and assesses his damages at the sum of $901.32, with interest from this date at the rate of six per cent per annum; and for the plaintiff and against the said defendants upon the fourth count of plaintiff's amended petition, and assesses his damages at the sum of $246.41, with interest from this date at the rate of six per cent per annum.''

These findings are abundantly supported by the evidence and the court could not rightly have done

otherwise than to render judgment for plaintiff. The evidence shows beyond dispute that plaintiff, in fact, was employed by and rendered services for Martin and Borders who concealed themselves behind the paper screen of a corporation that was never brought into legal existence. Though the articles of incorporation stated that the capital stock of $100,000 was paid in full, not one penny of it was paid in money or in anything that resembled or even professed to be property. The contract between the Mosota Company and the alleged incorporators which was turned over in pretended payment of the capital stock sprang from a contract between the Arlington and Mosota Companies which was not executed and never had a spark of vitality. The corporation, therefore, was thrust into the business world without a dollar of tangible assets. It was a fraud upon the corporation laws of this State which require all of the capital stock of a proposed corporation to be subscribed and at least one half paid up, as a prerequisite to the issuance of a certificate of incorporation.

The attempt to make the subsequent contract between the Arlington and defendant companies serve as a payment of the capital stock is unavailing. In the first place that contract was not produced at the trial and its full terms and conditions are not before us and in the next place we do not perceive on what ground a contract between a vendor and a vendee corporation could be utilized by the latter in paying up its capital stock which its articles had falsely stated had been paid in full.

Of course plaintiff, in a collateral suit, could not successfully assail the legal existence of the defendant corporation and charge Martin and Borders with liability as partners doing business in the name of a fictitious corporation. It is the law of this State that the failure of incorporators "to pay into the company's treasury a part or all of the money due on the stock

issued to them, does not have the effect, in a collateral suit against the company by private persons, to nullify the certificate of the Secretary of State granting to the company the right of franchise to be a corporation.'' [Bank v. Rockefeller, 195 Mo. 15.]

The present suit is not of that kind, but recognizes the existence of the corporation and seeks to recover from Martin and Borders, under the provisions of sections 3004 and 3006, Revised Statutes 1909, upon the theory that they were the real incorporators and sole owners of all the capital stock, that the stock had not been paid and that the amount of their stockholders' liability exceeded the debts they had paid by an amount sufficient to discharge all of the remaining unpaid liabilities. This position is fully sustained by the proof which shows that none of the capital stock of $100,000 has been paid and that Martin and Borders, if entitled to set off the amount they expended for the account of the corporation, still owe about $65,000 upon their stockholders' liability, which is more than sufficient to pay the remaining debts.

The statutes contemplate that a creditor of a defunct corporation may have an action at law against the stockholders where the corporation has ceased to be a going concern, has disposed of all its tangible assets, has no means or hope of resuscitation and the statutory liability of the stockholders is sufficient to discharge all of its unpaid debts. [Schneider v. Johnson, 164 Mo. App. 639.]

The judgment is for the right party and, there being no prejudicial error in the record, is affirmed.

All concur.