426 F.Supp. 886 (1977)
PROVIDENCE STATE BANK, Plaintiff,
v.
Donald R. BOHANNON et al., Defendants.
No. S73 C 13.
United States District Court, E. D. Missouri, Southeastern Division.
January 14, 1977.
*887 Rush H. Limbaugh, Jr., Limbaugh, Limbaugh & Russell, Cape Girardeau, Mo., *888 Thomas D. Graham, Graham & Graham, Jefferson City, Mo., for plaintiff.
Albert E. Schoenbeck, St. Louis, Mo., G. Weber Gilmore, Gilmore & Gilmore, Bernard C. Rice, Blanton, Rice, Sickal, Gilmore & Winchester, Sikeston, Mo., for defendants.

MEMORANDUM OPINION
REGAN, District Judge.
The underlying question in this case is whether Providence State Bank (Providence) may recover from defendants or any of them all or part of the balance of the losses it sustained consequent upon the dishonor of certain checks for which Providence had given immediate credit to Gibson Livestock Company (Gibson), the payee. We have jurisdiction because of diversity of citizenship, the amount involved as to each defendant being substantially in excess of $10,000 exclusive of interest and costs.
The dishonored checks, drawn by Gibson on the First National Bank of Sikeston, Missouri (First National) and deposited in Gibson's account in Providence, were returned unpaid on the basis of "insufficient funds." So, too, were a number of other checks. In a prior suit by Providence against First National in this Court, Judge Webster found that Providence had sustained net damages of $340,138.14 by reason of the dishonor of 23 checks by First National, but that insofar as that bank was concerned, it was entitled to credits for amounts which Providence had paid out after learning of the dishonor of the checks. Deducting that sum ($139,963.92), Judge Webster entered judgment against First National in the amount of $200,174.22. Credit on the judgment was allowed for $100,000, the value of the security which Providence had taken from Gibson after the loss was incurred. That judgment having been paid, Providence now seeks to recover the balance of the money it paid out on the checks.
Defendant Bohannon served as president of First National from 1966 until he resigned in the latter part of January, 1971. He continued, however, to be a director of the bank until June of that year. Joel Montgomery (Montgomery) was also a director during that period. The majority stock interest in the bank was owned by the First National Holding Company. In November or December, 1970, at the instance of Montgomery, the Montgomery Trust (Trust) of which defendants Helen M. Johnson and C. E. Montgomery were trustees, purchased, together with Bohannon, the controlling interest in the holding company. The holding company stock was held in the name of Bohannon.
The Trust had, some years earlier, been set up by Montgomery for the benefit of his children. All decisions were made by Montgomery. The trustees (Montgomery's sister and brother) were mere puppets doing Montgomery's bidding at all times and signing at his request whatever documents he presented to them, without even reading what they signed. The funds (or at least a substantial part thereof) with which the holding company stock was acquired was obtained by a loan from Union Planters National Bank (Union Planters) in Memphis, Tennessee, the loan being evidenced by a note in the sum of $380,000, of which Bohannon and his wife, Montgomery and his wife, and the trustees were makers. The note was secured by the bank holding company stock. Montgomery and the Trust were long-time customers of Union Planters, together being among the largest borrowers from the bank, their total borrowings being in the millions of dollars.
Gibson was a Kentucky corporation engaged in the livestock business in the areas of Sikeston, Missouri, Providence, Kentucky, and other areas. Its principal owner was Thomas (Tommy) Gibson. At the times in issue, Bohannon owned a third of its capital stock and was an officer and director thereof. Gibson's operations were quite extensive, so that large amounts of operating capital were required. It had accounts in a number of banks, including First National and Providence. Both First National and Providence had for some time given immediate credit to Gibson on uncollected *889 items. Finally, in May, 1970, as the result of criticism by bank examiners (in large part based on Bohannon's conflict of interest), First National closed the Gibson account in that bank. Subsequently, the account in First National was reopened on a strictly cash basis. As for Providence, the problems resulting from the large number of Gibson checks which had been returned for insufficient funds became so acute in December, 1970, that it indicated the account would have to be closed.
In the latter part of December, 1970, Bohannon and Tommy Gibson met with David Sutherland, the president of Providence, in that bank's office. Bohannon represented to Sutherland that an arrangement had been worked out with Union Planters for a half million dollar line of credit whereby immediate funds would be made available by that bank to cover all checks drawn by Gibson on its First National account. He explained that the purpose of this arrangement was to enable him to keep track of and control the handling of the funds. Bohannon assured Sutherland that because of this credit arrangement with Union Planters all checks drawn by Gibson on its First National account would be paid, and so could safely be given immediate credit by Providence. Although Sutherland assumed that Bohannon was speaking as the president of First National, it appears that he had no authority to do so. On the faith of Bohannon's representations and assurances, Sutherland, on behalf of Providence, agreed to give immediate credit on the Gibson checks.
Bohannon, accompanied by Montgomery, opened a Gibson account at Union Planters. Arrangements were then made with John Hembree, its Vice-president, for Union Planters to give immediate credit on uncollected drafts to be deposited in the Gibson account. Hembree knew that Bohannon was president of First National. He also knew of Montgomery's relationship to the bank.
There is a conflict in the evidence as to whether Union Planters had in fact been guaranteed by the Trust against any loss it might incur in operating the account. Hembree unequivocally denied that a line of credit had been extended to Gibson or that the Montgomery defendants had guaranteed its account. He testified that he opened the Gibson account simply as an accommodation to First National, its correspondent bank, that it was normal and routine procedure for Union Planters to give immediate credit on sight drafts in sizable amounts to its customers in the cattle business, and that in this instance his agreement to follow a similar procedure with Gibson was in reliance on the integrity of Bohannon to handle the transactions properly. Defendants' position is that Hembree would not permit immediate credit on Gibson drafts absent a guaranteed line of credit, and that a written guarantee together with a collateral note in the amount of $450,000 were delivered to Hembree for that purpose. As appears infra, we credit Hembree's testimony.
Gibson would purchase cattle and then resell the cattle to raise the necessary funds for its purchase. Tommy Gibson, in Kentucky, would relay the sale data to Bohannon in Sikeston (about 100 miles away) and he would then draw sight drafts upon the buyers and send them to Union Planters in Memphis. Union Planters gave immediate credit to Gibson on the uncollected drafts. In the meantime, Tommy Gibson would write checks on its First National account payable to Gibson, and deposit them in its Providence account to obtain funds to pay for the cattle purchases. Providence gave immediate credit for the checks so deposited, and would then send the checks via a correspondent bank to First National. A period of four to six days would elapse before the checks arrived at First National. Bohannon would daily determine the amount required to cover these checks and then call Union Planters to authorize it to transfer by wire the necessary funds which would then be applied to payment of the Gibson checks. By means of this float, Gibson had the interest-free use of hundreds of thousands of dollars for short periods of time.
*890 For the first months, the operation of the "banking triangle" worked smoothly. However, the dollar volume of Gibson's transactions almost quadrupled from February to April, causing Bohannon to be concerned about the legitimacy of some of the Gibson transactions, and after several drafts he drew at Tommy Gibson's instance had been returned unpaid, he concluded that the balance in the Union Planters account might not represent collectible funds. In late afternoon on Thursday, April 29, 1971, Bohannon decided he would not transfer any more funds from Union Planters to First National, and on the next three banking days he instructed First National to return the checks which Providence had sent to it for collection. However, neither Bohannon nor First National advised Providence of the decision not to honor the checks, and it was not until late in the afternoon of May 3, that Providence learned, in a telephone call from its correspondent bank, that the checks were being returned.
At the times in question, there were more than sufficient funds on deposit in the Union Planters' account which Bohannon could have transferred to First National for payment of the checks deposited in Providence. Instead, to the extent these funds on deposit represented collectible drafts, the money (except for $30,000) was applied by Bohannon for purposes other than payment to Providence.
We consider first the issue of Bohannon's liability as stockholder. That Gibson, which received payment on the checks it deposited, is primarily liable therefor to Providence admits of no doubt. Bohannon's liability is dependent on other considerations. The evidence is uncontradicted that Bohannon subscribed for stock in Gibson with a par value of $170,000 and that only $50,000 of the price was paid. The balance of $120,000 is reflected on the books of the corporation as a note receivable from Bohannon in the amount of $120,000, but is not identified as owing for the corporate stock purchase. The note has never been paid. Under Kentucky law, as at common law, a shareholder is liable to corporate creditors to the extent his stock has not been paid for.
This general rule is not questioned by Bohannon. He contends that at the time Providence extended credit to Gibson it knew that his stock had not been paid for, and so is not entitled to recover the unpaid balance. The difficulty with this contention is that there is no substantial evidence that Providence had knowledge of the fact that Bohannon's stock had not been paid for, and we find that it had no such knowledge. A creditor dealing with a corporation in good faith may assume that its stock has now been paid for (Williams v. Chamberlain, 123 Ky. 150, 94 S.W. 29). We add that it does not lie in the mouth of Bohannon to criticize Providence for paying Gibson's checks prior to collection in view of the fact that his own representations had induced Providence to do so.
Bohannon further argues that the recovery of a judgment against the corporate debtor and a nulla bona return on an execution are conditions precedent to enforcing the corporate liability against him. However, the sole purpose for following such procedure is to establish that the primary debtor cannot be made to satisfy its obligation; and to avoid controversy, it is the better practice to go through such motions. Nevertheless, insofar as the substantive law is concerned, a showing that recovery against the corporation is futile suffices. The manner in which the inability of the corporation to respond is demonstrated is merely procedural. Louisville & N. R. Co. v. Nield, 186 Ky. 17, 216 S.W. 62, 64. In the present case, we are convinced, and so find, that Gibson is hopelessly insolvent, devoid of assets and out of business. In this state of facts, a formal nulla bona return on an execution is unnecessary. The law never requires the doing of a useless act. Williams v. Chamberlain, supra.
Missouri law is in accord. See Schneider v. Johnson, 164 Mo.App. 639, 147 S.W. 538 and O'Kell v. Chama Valley Lands & Irrigation Co., 181 Mo.App. 466, 168 S.W. 887. As the Missouri Supreme Court aptly stated in *891 Guerney v. Moore, 131 Mo. 650, 32 S.W. 1132, "Indeed, upon the uncontroverted facts of this case, we are justified in holding that no execution against the corporation was necessary to charge the stockholders, upon the principle that `the law does not require a vain or impossible thing',a maxim held to be peculiarly applicable in similar cases."
In his brief, Bohannnon argues that he is entitled to set off against his liability for his unpaid stock subscription the sum of $16,874.95 he claims is still owing to him for salary. This alleged set-off was not pleaded. There is no contention (and certainly no evidence) that an agreement had been entered into whereby the stock was to be paid for in whole or in part by services to be rendered to the corporation. Nor do we credit his vague and uncorroborated testimony that in February, 1971, his salary "was supposed to be increased to $17,500 a year." And there is no evidence as to what, if any, value could reasonably be placed upon Bohannon's services. We believe, and so find, that Bohannon was fully paid for whatever services he may have performed for Gibson.
Hence, having found that Gibson owes no salary to Bohannon, it is unnecessary to determine whether in an action by a creditor, a stockholder may set off against the amount of his unpaid subscription a sum allegedly owing to him by the corporation for services. In our judgment, Bohannon is liable for the entire amount of $120,000 he still owes for the stock.
As we have noted, Bohannon was an officer and director of Gibson. As such, he arranged for the purchase by the corporation of 250 shares of its stock held by an Allen Vanover. As the result of this purchase, the capital of Gibson was, at the very least, impaired. Under Kentucky law, a corporation may not purchase its own stock under these circumstances. on the theory that Bohannon's participation in the transaction creates liability on his part for breach of his duties as officer and director, Providence seeks to hold Bohannon for the purchase price paid to Vanover by Gibson. Although an officer and director owes a fiduciary duty in the management of the corporation, this does not mean that he is absolutely liable for losses which could not reasonably have been anticipated. At the time in question, Bohannon was not aware that Gibson was insolvent or that it would become such as a result of the Vanover transaction. The evidence is not sufficient to warrant a finding of negligence on Bohannon's part. Plaintiff failed to sustain its burden of proof as to this claim.
A further basis of asserted liability on the part of Bohannon is his fraudulent conduct in inducing Providence to give immediate credit to Gibson on its checks. But for the representation of Bohannon that he had made credit arrangements with Union Planters, on the basis of which he assured Providence that all Gibson checks would be honored by First National, Providence would not have given immediate credit on the checks. Even if Bohannon did not actually know that Montgomery was pulling the wool over his eyes he is not thereby relieved of liability. The representations were made as of Bohannon's own knowledge for the purpose and with the intent that Providence believe and act thereon. And the very assertion of knowledge which one does not have is itself a false representation. Bohannon's bad faith is further evidenced by the manner in which he put a stop to the check float with an entire disregard of Providence's interests. Not only were there sufficient funds in Union Planters which could have been used to make good Bohannon's assurances the Gibson checks would be paid, but with knowledge that Providence was continuing to give credit after he had made it impossible for First National to honor the checks, he took no steps whatever to promptly notify Providence of what he had done.
It is our further view that Montgomery became and was a party to the fraud perpetrated upon Providence. Knowing that Bohannon was relying upon the allegedly guaranteed line of credit and that Providence would act upon the belief that payment of the checks had been guaranteed, *892 Montgomery, in callous indifference to the consequences to Providence created the facade of a guarantee in order to mulct Gibson of $52,000. As held infra, the payment had not been guaranteed, but Montgomery fraudulently withheld that information from Providence.
Although we have found fraudulent conduct on the part of Bohannon and Montgomery resulting in damage to Providence, the facts do not permit us to make an award of damages. In the suit against First National, Judge Webster expressly found that although Providence sustained net damages of $340,138.14 by reason of the dishonor of the checks, it was "entitled to credits for amounts paid out by [Providence] after [it] learned of the dishonor of said checks in the amount of $139,963.92." Obviously, the same considerations are applicable to the instant situation.
The burden of proving the amount of damages sustained as the direct result of the fraudulent conduct is upon plaintiff. Basically, the recovery sought in the present suit is the amount paid out after Providence became aware of the fraud, together with interest. Interest is not recoverable as damages insofar as this action is premised on the fraudulent tortious conduct of Bohannon and Montgomery. And since plaintiff continued to pay out money after it was reasonably aware of the true facts, it may not recover such payments as damages from the tortfeasors.
Providence has failed to sustain its burden of proving what amount of its loss (for which it has not heretofore been compensated) was paid out in reasonable reliance upon the fraudulent representations.
A consideration of the remaining claim against the Montgomery defendants necessitates a further statement of facts with respect to the alleged guaranty of a line of credit extended by Union Planters. It appears that discussions between Bohannon and Montgomery were held, as the result of which Montgomery agreed that for $52,000 payable $1,000 a week he would make arrangements to guarantee payment of drafts and checks of Gibson deposited in Union Planters so that immediate credit would be given on the uncollected funds.
Montgomery testified that Hembree agreed to give immediate credit on Gibson drafts only on the condition that both he and Trust guarantee the account and supply collateral. A non-negotiable demand collateral note in the amount of $450,000 payable to the Trust was executed by Bohannon and his wife, Thomas Gibson and his wife, Gibson, and Gibson Land and Cattle Company, Inc. for the purpose of securing the Trust against any loss on the guaranty. The note, which was secured by second mortgages on property of the two corporations and by two security agreements, provided that if, upon termination of the agreement, the Trust had not sustained any loss as the result of the obligations therein, the note and security were to be returned to the makers and released of record.
Twelve payments, $1,000 each were made out of Gibson funds, the checks being sent by Bohannon to Union Planters to be applied as payments on the $380,000 note which had been executed for the loan with which the First National Holding Company stock was purchased.
When Bohannon directed First National on April 29th to return the Gibson checks to Providence, the result was to terminate the three-bank float. Although some of the drafts on which Union Trust had given immediate credit were not collected, the money was not withdrawn, so that neither Union Planters nor First National sustained any loss whatever. And when Bohannon ended the arrangement, there remained on deposit in Union Planters a substantial cash balance (after deducting the amounts represented by uncollectible drafts). Out of this balance, Bohannon paid the Trust $40,000, following Montgomery's demand that Gibson owed that sum for the "guarantee." The fact is that Montgomery would not release the security he had obtained from Bohannon unless the $40,000 was paid, even though the collateral note expressly directs it be done. Plaintiff *893 seeks to recover the $40,000 together with the $12,000 theretofore paid.
We are convinced that no guarantee was ever given Union Planters by Montgomery or the Trust, and we credit Hembree's testimony to that effect. It is significant that neither the alleged guaranty nor even a copy thereof was produced by the Montgomery defendants, and that there is no record at Union Planters that such a guarantee had ever been in its files. It is our view that as soon as he realized that Hembree would give credit on the Gibson drafts without a guarantee, Montgomery simply kept his mouth shut and did nothing. And if so, that might explain, but not justify, the payments Bohannon made. And it is our further view that Bohannon would not have decided to stop the transfer of funds from Union Planters to First National but for his belief that a loss might result on the "guaranty" with consequent liability to himself on his own secured guaranty. The ultimate effect was to thrust upon Providence the loss which Montgomery had represented to Bohannon would initially be borne by himself and the Trust. Neither Montgomery nor the Trust was entitled to the $52,000 which they received under false pretenses. The Montgomery defendants should not be unjustly enriched at the expense of Providence. The money they wrongfully received is owed to Gibson and through it to Providence.
The major contention urged by defendants is that principles of res judicata or collateral estoppel preclude Providence from maintaining this action. We do not agree.
Defendants rely on the fact that the prior suit against First National was based on the dishonor of the same checks which are the subject matter of this action and that the judgment in that suit has been satisfied. On the premise that defendants were joint tortfeasors with First National and that the release of one joint tortfeasor has the effect of releasing all others, defendants argue that inasmuch as the damages for which First National was held liable were caused by Bohannon, and that since Montgomery and the Trust were allegedly his joint venturers or agents, the satisfaction of the judgment against one wrongdoer responsible for all of the damage has the legal effect of discharging all other wrongdoers.
The Court expressly found in the prior suit that although Providence had actually been damaged to the extent of $340,138.14 by reason of Bohannon's reprehensible conduct, First National was liable only for $200,174.22 of such damages, simply because insofar as First National was concerned, its liability was held to be limited to damages resulting from its failure to give prompt notice of dishonor.
Defendants overlook the vitally distinguishable fact that insofar as the present action pertains to Bohannon's liability for his unpaid stock in the amount of $120,000 and to the liability of Montgomery and the Trust for the $52,000, the claim of Providence is premised on Gibson's liability for money had and received from Providence and on defendants' liability to Gibson, the primary debtor. Gibson's liability for the entire amount it received is not affected by any stupidity or negligence on the part of Providence in continuing to advance money after notice of dishonor. Having found supra that Providence is not entitled to damages resulting from the fraudulent representations which it sustained after becoming aware of the fraud, we express no opinion as to the effect of the judgment in the First National suit upon that claim. However, nothing in the prior suit bore upon the basic issues which we have held are determinative of this action.
The final issue is the amount to be recovered by Providence.
We start with the fact that Providence is entitled to the full amount of the payments it made to the Gibson account and for which it has not been reimbursed. The evidence shows that on November 8, 1974, during the pendency of this suit, the Gibson liability was reduced to judgment. That judgment was in the amount of $155,977.54 plus interest to August 14, 1974 in the sum of $46,922.95 and interest from that date to *894 the date of judgment at the rate of $29.91 per day. We find no basis for defendants' suggestion of collusion merely because the judgment was a summary one of which Bohannon had no prior knowledge. Defendants make no contention that Gibson does not in fact owe Providence the amount of the judgment. And we are not advised of any reason we should not give it full faith and credit.
We reject, as without merit, defendants' further contention that payments received by Providence from its former president ($40,000) and from Continental Insurance Company ($25,000) should be credited on its claim against Gibson, thereby reducing the amount recoverable from defendants. We find that both such payments were received for other purposes and on other claims.
Of course, defendants are liable to Providence only to the extent we have found them liable to Gibson. The foregoing memorandum constitutes our findings of fact and conclusions of law. Accordingly, judgment will be entered against Bohannon in the amount of $120,000 (owing for the stock) and against Montgomery and the Trust in the amount of $52,000, together with interest thereon at 6 per cent per annum from May 6, 1971, (the date they wrongfully obtained the $40,000).